# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **CHRIS REED,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| **v.** | § | Civil Action No. **3:14-CV-4412-L** |
| | § | |
| **LKQ CORPORATION,** | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

The court makes the following findings of fact and conclusions of law by a preponderance of the evidence[1] pursuant to Rule 52(a) of the Federal Rules of Civil Procedure[2] following a hearing and bench trial.

---

[1] Proving a fact by a "preponderance of the evidence" means showing that the existence of a fact is more likely so than not. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983). Thus, to prove a fact or claim by a preponderance of the evidence, a party must prove that it is more likely than not that its version of the facts is true. *Id.*

[2] In preparing this memorandum opinion and order, the court carefully considered the trial testimony and exhibits and applied the standard in this circuit for findings of fact and conclusions of law. *See Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standard for findings and conclusions under Federal Rule of Civil Procedure 52). In accordance with that standard, the court has not set out its findings and conclusions in "punctilious detail" or "slavishly trace[d] [] the claims issue by issue and witness by witness." Neither has the court "indulge[d] in exegetics, or pars[ed] or declaim[ed] every fact and each nuance and hypothesis." *Id.* (internal quotation marks and citations omitted). The court instead has limited its discussion to those legal and factual issues that form the basis for its decision. *Id.*

The facts contained herein are either undisputed or the court has made the finding based on the credibility or believability of each witness. In doing so, the court considered all of the circumstances under which the witness testified, including: the relationship of the witness to Plaintiff or Defendant; the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or the lack thereof; the reasonableness or unreasonableness of the witness's testimony; the opportunity of the witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail. When necessary, the court comments on the credibility of a witness or the weight to be given to a witness's testimony.

## I. Procedural Background

On September 29, 2014, Chris Reed ("Mr. Reed" or "Plaintiff"), a homeowner in Burleson, Texas, filed this lawsuit in state court against LKQ Corporation ("LKQ" or "Defendant"), the owner and operator of a 71.5-acre automobile reclamation and parts distribution facility across from his property. Mr. Reed alleges that dust, debris, trash, and noise generated by LKQ's construction and operation of its salvage business substantially interfered with his use and enjoyment of his property, thereby constituting a private nuisance. Def.'s Not. of Removal, Ex. A (Pl.'s Orig. Pet.) (Doc. 1-2). He seeks to recover damages based on the alleged injury to property and personal harm under the tort-based doctrines of intentional nuisance, negligent nuisance, and abnormally dangerous activity nuisance (also known as strict liability nuisance). *Id.*

On December 17, 2014, LKQ removed the state action to federal court, contending that complete diversity of citizenship exists between the parties and that the amount in controversy, exclusive of interest and costs, exceeds $75,000. Def.'s Not. of Removal 1 (Doc. 1). On February 10, 2015, with leave of court, Mr. Reed filed Plaintiff's First Amended Complaint ("Amended Complaint") (Doc. 11). Following discovery, on March 28, 2018, LKQ filed a motion for summary judgment on all claims, arguing that it was entitled to judgment as a matter of law because Mr. Reed had failed to raise a genuine dispute of material fact as to each essential element of a private nuisance claim. On July 6, 2018, the court granted LKQ's motion for summary judgment on Mr. Reed's claim for strict liability nuisance but ruled that his private nuisance claim based on intentional and negligent nuisance remained for trial. Mem. Op. & Order (Doc. 44).

---

Finally, during the course of trial, the court may have carried various objections made by the parties to the evidence. To the extent the court refers herein to such evidence, the objection is overruled if the court has included and relied on it. If the evidence was not included, this means the court overruled the objection or determined that the evidence was unnecessary for the findings and conclusions it makes.

The court held a bench trial on the remaining nuisance claims on September 12, 2018. The parties were represented by counsel. The court heard testimony from the following witnesses: Mr. Reed; his wife Natalie Reed ("Mrs. Reed"); and Steven Massey ("Mr. Massey"), LKQ's corporate representative. The parties each filed Proposed Findings of Fact and Conclusions of Law on March 21, 2019. (Docs. 76 and 78). The official transcript from the bench trial was filed on August 7, 2019. (Tr. of Proceedings, hereinafter "Tr.") (Doc. 81).[3]

## II.     Subject Matter Jurisdiction

The court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a). Mr. Reed initially filed this lawsuit in the 413th Judicial District Court of Johnson County, Texas. Def.'s Not. of Removal, Ex. A (Pl.'s Orig. Pet.) (Doc. 1-2). On December 17, 2014, LKQ filed its Notice of Removal, contending that pursuant to 28 U.S.C. § 1332, this court has subject matter jurisdiction because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000. Def.'s Not. of Removal 1 (Doc. 1). Specifically, LKQ asserts it is a Delaware corporation and "does not have its principal place of business in Texas," and that Mr. Reed is a Texas citizen. *Id.* at 1. Accordingly, based on the Notice of Removal and Plaintiff's Original Petition, the court concludes that it has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

As part of its continuing duty to police its subject matter jurisdiction, *see Ruhgras AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999), the court notes *sua sponte* that in the Amended Complaint, Mr. Reed alleges that he "is an individual who resides in Johnson County, Texas," and

---

[3] On September 9, 2019, after granting the parties' Agreed Motion Regarding Site Inspection and LKQ Operations (Doc. 86), the court visited and inspected Mr. Reed's property and informed that parties that it was considering whether to reopen the evidence to include its observations from the site visit. After further review of the trial record, the court concludes that reopening the evidence is unnecessary and, accordingly, its findings of fact and conclusions of law are based solely on the evidence admitted at trial and testimony of the witnesses.

that LKQ "is a Texas corporation." Am. Compl. ¶¶ 1-2 (Doc. 11).[4] In LKQ's Answer, it "admits

the averments contained in Paragraph 1 of Plaintiff's First Amended Complaint," and "admits the

averments contained in Paragraph 2 of Plaintiff's First Amended Complaint." Def.'s Ans. to Pl.'s

First Am. Compl. ¶¶ 1-2 (Doc. 21). Although it would appear that complete diversity is not present

based on the Amended Complaint and Answer thereto, as Mr. Reed and LKQ are both alleged to

be Texas citizens, caselaw makes clear that "all challenges to subject-matter jurisdiction [are]

premised upon diversity of citizenship against the state of facts that existed at the time of

[removal]—whether the challenge be brought shortly after filing, after the trial, or even for the

first time on appeal." *Settlement Funding, L.L.C. v. Rapid Settlements, Ltd.*, 851 F.3d 530, 537

n.14 (5th Cir. 2017) (quoting *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 571

(2004)); *see also Coury v. Prot*, 85 F.3d 244, 249 (5th Cir. 1996) ("In cases removed from state

court, diversity of citizenship must exist both at the time of filing in state court and at the time of

removal to federal court. If diversity is established at the commencement and removal of the suit,

it will not be destroyed by subsequent changes in the citizenship of the extant parties.") (citations

omitted).

At the time of Plaintiff's Original Petition and at the time of removal, diversity of

citizenship was established. Allegations in the Amended Complaint, admitted in Defendant's

---

[4] Mr. Reed alleges he "*resides* in Johnson County, Texas." Am. Compl. ¶ 1 (Doc. 11) (emphasis added). A natural person is considered a citizen of the state where that person is domiciled, that is, where the person has a fixed residence with the intent to remain there indefinitely. *See Freeman v. Northwest Acceptance Corp.*, 754 F.2d 553, 555-56 (5th Cir. 1985). "'Citizenship' and 'residency' are not synonymous." *Parker v. Overman*, 59 U.S. 137, 141 (1855). "For diversity purposes, citizenship means domicile; mere residence in [a] [s]tate is not sufficient." *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 793, 799 (5th Cir. 2007) (citation and quotation marks omitted). "Domicile requires residence in [a] state and an intent to remain in the state." *Id.* at 798 (*citing Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989)). Mr. Reed's allegations relate to residency, rather than citizenship. In light of the record and Mr. Reed's testimony at the September 12, 2018 bench trial, however, the court concludes he has adequately alleged and convinced the court that he is a citizen of Texas for diversity purposes, and was so at the time the lawsuit was initially filed and later removed.

Answer—that Mr. Reed and LKQ are both citizens of the State of Texas—are akin to a citizenship change involving extant parties and, therefore, even assuming these pleadings are not the product of attorney error, they do not affect the court's analysis of its subject matter jurisdiction. Further, the court takes judicial notice pursuant to Federal Rule of Evidence 201(b),[5] that LKQ is a Delaware corporation formed in 1998 with its North America headquarters in Chicago, Illinois. http://www.sec.gov (Form 10-K).

## III.    Findings of Fact[6]

### A.    The Parties

1.      LKQ is the "leading provider of alternative and specialty parts to repair and accessorize automobiles and other vehicles," and has operations in North America, Europe and Taiwan. http://www.lkqcorp.com. LKQ has over 51,000 employees in 1,700 locations in 31 countries. http://www.lkqcorp.com/lkq-global_aboutus.[7]

---

[5] This rule allows the court to take judicial notice of facts that are not subject to reasonable dispute in that they are either (1) generally known within the territorial jurisdiction or (2) capable of accurate determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 831 (5th Cir. 1998). Pursuant to Rule 201(b), the court takes judicial notice of LKQ's filings with the Securities and Exchange Commission indicating it is a Delaware corporation with its North America headquarters in Chicago, Illinois. *See Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996) (taking judicial notice of documents required by law to be filed with Securities Exchange Commission).

[6] Insofar as any finding of fact constitutes a conclusion of law, it is adopted as a conclusion of law; and insofar as any conclusion of law made herein constitutes a finding of fact, it is hereby adopted as a finding of fact.

[7] Pursuant to Federal Rule of Evidence 201(b), the court takes judicial notice of this information from LKQ's company website. *See United States v. Flores*, 730 F. App'x 216, 219 n.1 (5th Cir. Apr. 18, 2018) (Haynes, J., concurring)  (internal citation omitted) (holding that "publicly available [information] on [a company's] official website" may be considered "an authoritative source" in certain contexts when the facts a court is taking notice of may be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); 2 McCormick on Evid. § 330, Facts Capable of Certain Verification (7th ed. 2016) ("Information obtained from online sources is becoming a frequently used basis for judicial notice. To this point, government and corporate websites and well-recognized mapping services are among the most commonly relied upon sources.") (footnotes omitted).

2.      LKQ owns and operates a 71.5-acre automobile salvage yard (the "LKQ facility")

at 2955 S. Burleson Boulevard, Burleson, Texas, at the corner of Interstate Highway 35W ("I-

35W") and County Road 518 ("CR 518"). Pl.'s Ex. 1A; Jt. Pretrial Order 6 (Statement of Stipulated

Facts) (Doc. 69). LKQ's business involves the retrieval of automotive parts from inoperable

vehicles, the disassembly of parts, and the reconditioning of parts for wholesale distribution as

after-market automobile parts and accessories. Pl.'s Ex. 4, at 3C-2.

3.      Mr. Massey is the plant manager of the LKQ facility, as well as three other facilities

in the Dallas-Fort Worth area. Tr. 139, lines 23-24.

4.      Mr. Reed is a technician employed by Oncor Electric Delivery ("Oncor") and has

been employed by Oncor for approximately twenty-five years. Tr. 18, lines 15-18.

5.      Mr. Reed owns a home and land located at 6825 CR 518 in Burleson, Texas, and

has lived there since 2001, along with Mrs. Reed and their two sons. Tr. 19, lines 1-15; Tr. 125,

lines 1-22; Pl.'s Ex. 1A. Along with his home, Mr. Reed's property includes a pool, a work shed,

and a hay field. Tr. 23, lines 14-15; Tr. 24, lines 9-11, 19-21.

6.      Mr. Reed's home and land are across from, and directly north, of the LKQ facility.

Tr. 19, lines 19-20; Pl.'s Ex. 1A. Prior to LKQ's construction, the land across from his home was

an open pasture with an agriculture zoning designation. Tr. 21, lines 17-20.

7.      Mr. Reed's home sits on an upslope from both CR 518 and the LKQ facility. Tr.

22, lines 20-25; Pl.'s Ex. 1B.

8.      Mr. Reed testified that the prevailing wind in the area of his property blows from

south to north. Tr. 41, line 8. In addition to Mr. Reed's testimony at trial, pursuant to Federal Rule

of Evidence 201(b), the court takes judicial notice that at Dallas/Fort Worth International Airport,

which is approximately thirty miles from Burleson, Texas, the wind is most often from the south

for 10 months, from February 8 to December 22, with a peak percentage of 70% on July 4. The wind is most often from the north for 1.5 months, from December 22 to February 8, with a peak percentage of 38% on January 1. https://weatherspark.com/y/145920/Average-Weather-at-Dallas-Fort-Worth-International-Airport-Texas-United-States-Year-Round.

9.     Mr. Reed's property is bordered on the western side with commercial properties. Tr. 132, lines 22-25 to Tr. 134, lines 1-22; Tr. 78, lines 1-5. I-35W abuts the commercial properties to the west of Mr. Reed's home, which sits less than one thousand feet from I-35W. Tr. 71, lines 14-15; Tr. 186, lines 4-12. A thick line of mature oak trees and a 10-foot metal fence, as well as buildings, separate Mr. Reed's home and I-35W. Tr. 71, lines 18-21.

10.    Mr. Reed's property is bordered on the eastern side by a gas well, sometimes referred to as a natural gas well lift station. Tr. 21, lines 7-8; Pl.'s Ex. 1A. Mr. Reed believes the gas well operates twenty-four hours per day, although he is not certain, and has a surface made of white chat. Tr. 82, lines 15-22; Tr. 76, lines 1-10. Mr. Reed makes money from the gas well. Tr. 82, lines 23-25 to Tr. 83, lines 1-13.

11.    The Reeds spend a significant amount of time outside, either around their pool, in the work shed, working the hay field, or entertaining friends. Tr. 24, lines 1-25 to Tr. 25, lines 1-10.

12.    Mr. Reed enjoys spending time outdoors on his property, and that is the reason he purchased the land in 2001. Tr. 24, lines 1-4.

13.    The Central Appraisal District of Johnson County, Texas, appraised the total market value of Mr. Reed's property in 2013 at $179,652, and in 2017 at $183,727. Tr. 114, lines 9-25; Tr. 115, lines 1-16; Def.'s Ex. 40.

**B.      Overview of Specific Use Permit and Commercial Site Plan for LKQ's Facility**

14.      On March 19, 2013, the Burleson City Planning and Zoning Commission held a public hearing to consider LKQ's request for a zoning change from "agricultural" to "industrial" to enable the development of its automotive reclamation and parts facility on 71.5 acres of land across from Mr. Reed's property. Pl.'s Ex. 16. Mr. Reed attended the public hearing and voiced his concerns and objections to the proposed zoning change. Tr. 25, lines 19-25 to Tr. 26, lines 1-15. Among other concerns, he explained that he and his family live across the road from the proposed zoning change and that changing the zoning from agricultural to industrial would cause issues with his home, including increased noise levels. Tr. 25, lines 2-25 to Tr. 26, lines 1-5.

15.      On April 1, 2013, Mr. Reed attended a Burleson City Council meeting concerning LKQ's request for approval of a Specific Use Permit ("SUP") "for the purpose of constructing an approximate 107,138 square foot Auto Reclamation and Parts Distribution facility." Pl.'s Ex. 16. Mr. Reed attended the meeting and voiced his concerns about LKQ's request for an SUP. Tr. 28, lines 12-13.

16.      Mr. Reed voiced his concerns and objections about the requested zoning change and SUP at multiple Burlington City Council meetings and Zoning and Planning Commission meetings that he attended in 2013, prior to construction. Tr. 25 - Tr. 28; Tr. 30, lines 14-16; Tr. 31, lines 4-16.

17.      On May 20, 2013, the City of Burleson Director of Community Development prepared a memorandum for the Mayor and City Council members of the City of Burleson, titled "Use and Restrictions and Mitigation Measures." Pl.'s Ex. 2. The memorandum states that because of proximity to existing residential development, use restrictions and design features would be implemented by the SUP ordinance to mitigate effects of the proposed business operations on

adjacent properties, including the following restrictions: (1) "The Open Salvage Yard component shall be used only for the storage and cataloging of reclaimed automotive parts and the sale and delivery to wholesale clients only"; (2) "No cutting, draining or part removal operations will occur within the Open Salvage Yard area"; and (3) "The Open Salvage Yard area shall be completely screened from all adjacent properties and public thoroughfares by a minimum 8 foot fence . . . with a ten foot wide buffer to be installed outside of said fence for tree and shrub planting." (the "Use Restrictions"). Pl.'s Ex. 2.

18.     During the May 20, 2013 Burleson City Council meeting, Mr. Reed again voiced his concerns and was approached by several representatives of LKQ, including Messrs. Massey, Ottis Lee, and Tim Nelson, who told him that the LKQ facility was going to be a "nice facility," not a "junk yard," and "not noisy or dirty." Tr. 33, lines 1-8.

19.     On May 20, 2013, the Burleson City Council adopted Ordinance C-737-13, authorizing the SUP and the Use Restrictions, and approved the zoning change from agricultural to industrial. Tr. 30, lines 7-11; Pl.'s Ex. 2.

### C.     Dust, Debris, Trash, and Noise During Construction of LKQ's Facility[8]

20.     Construction of the LKQ facility began in the fall of 2013, and continued until approximately May or June of 2014. Tr. 64, lines 14-15; Tr. 40, lines 4-9.

21.     Immediately after construction began, LKQ bulldozed all the trees screening Mr. Reed's property from the LKQ facility. Tr. 35, lines 6-12. In preparing the site, LKQ dragged and scraped the land. Mr. Reed testified that "dirt was kicking up into the air. It was unreal. It was

---

[8] During trial, the lawyers and parties used the terms "dust" and "dirt" interchangeably. The court uses "dust" to refer to both, as dust includes the particles of airborne soil or other matter Mr. Reed testified were blown by the prevailing winds from LKQ's property to his property. Further, the court uses the term "debris" to refer specifically to pieces of styrofoam the Reeds testified blew onto the property during construction. "Debris" does not include "trash."

getting as high as the clouds." Tr. 35, lines 22-24. The process of bulldozing the trees and dragging and scraping the land took approximately two months. Tr. 35, lines 8-9.

22.     Once construction began, the Reeds frequently found their home, windows, patio, patio furniture, outdoor grill, and vegetation covered with a thick layer of dust. Tr. 36, lines 23-24; Tr. 41, line 8. Mr. Reed testified, "I had trash and debris blowing all over my property, and I had tons of styrofoam blowing onto my property." Tr. 36, lines 24-25 to Tr. 37, line 1. Photographs taken by Mr. Reed during construction show a copious amount of dust and styrofoam debris on his property. Pl.'s Exs. 17-F through 17-V.

23.     Mr. Reed testified that styrofoam shavings and dust from LKQ filled his pool and blocked the diatomaceous earth ("DE") filters. Tr. 37, lines 1-18. Although he previously cleaned the pool's DE filters twice yearly, because of the amount of dust generated by the construction, he was required to clean them much more often than previously, and he cleaned the styrofoam debris from the pool daily. Tr. 38, lines 4-11. Mr. Reed testified that a week after he cleaned the DE filters, it "looked like a sand storm had come through," requiring him to clean them again. Tr. 38, lines 7-8. When he vacuumed the pool, the dust and debris clogged the DE filters, and he would be forced to clean them again. Tr. 39, lines 3-16.

24.     Mr. Reed testified that on one particular Saturday during construction, the back-up beeper on a truck at LKQ's facility was going off all night, even after the facility was closed. Tr. 43-44. He testified that he and his wife attempted to reach someone from LKQ regarding the noise but could not and, ultimately, they were forced to call the City of Burleson Police Department at 2:00 a.m., after which the back-up beeper finally ceased. Tr. 44, lines 5-7.

25.     Mr. Reed testified that during construction, LKQ used floodlights at night that "lit up" his home. Tr. 42, lines 9-14.

26.     Mr. Reed raised concerns about LKQ bulldozing all the trees screening his property from the LKQ facility, as well as about the dust and debris caused by LKQ's construction, with both LKQ and the City of Burleson. Tr. 38, lines 15-16; Tr. 42, lines 1-6.

27.     Mr. Reed testified that during construction, LKQ made "no attempt to try to stop the dust from coming up. They just kept going about their business of what they were trying to accomplish." Tr. 42, lines 13-16.

28.     Mr. and Mrs. Reed both testified that prior to LKQ commencing construction, the Reeds had no problems with dust or debris on their property. Tr. 121, lines 11-14; Tr. 126, lines 23-25.

29.     Mrs. Reed testified that during the construction phase, so much debris was blowing from LKQ's property onto the Reed's property that "it was like snowing styrofoam." Tr. 128, line 6.

30.     During the construction phase, in addition to complaining about the dust and debris, Mr. Reed complained to LKQ about the "back-up beepers that [were] on their vehicles that [were] constantly beeping." Tr. 42, lines 6-8.

### D.      Amendments to the SUP and Communications with Mr. Massey

31.     On May 4, 2014, Mr. Reed attended a City Council meeting convened to consider LKQ's request for amendments to the SUP, at which he again voiced his objections and complained about the dust, debris, and noise caused by the construction. Tr. 44, lines 8-15; Tr. 45, lines 13-17. He also expressed concern about LKQ's removal of trees along CR 518 and the lack of screening between his property and the LKQ facility. Pl.'s Ex. 3.

32.     On May 9, 2014, Mr. Massey sent an e-mail to Plaintiff stating: "Please accept my sincere apologies for any inconveniences you might have experienced since our construction

began. Developing a facility of this size is a major undertaking and will often create nuisances for surrounding properties. We would like to resolve these items that you may have experienced as a result of our construction." Pl.'s Ex. 25.

33.     In the May 9, 2014 e-mail, Mr. Massey offered a proposal to help screen Mr. Reed's property from LKQ's facility by planting 12 trees on Mr. Reed's property at a cost of $3,400 to LKQ. Pl.'s Ex. 25. He also asked Mr. Reed to quantify those items for which he sought compensation, including dust at his home and on his air conditioner, dust and styrofoam in the pool, loss of hay, and trash in the yard, stating, "While the issues are directly related to construction, we certainly understand that it is our responsibility as [a] good citizen and neighbor to resolve these items." Pl.'s Ex. 25.

34.     Mr. Reed rejected Mr. Massey's offer to plant trees because he was concerned that he would not be able to bale hay in his hay field if leaves and foliage from the trees fell into the hay. Tr. 47, lines 16-18.

35.     LKQ offered to help pay Mr. Reed for inconveniences and damage caused by construction. Tr. 90, lines 4-6, Tr. 95, lines 19-24. Messrs. Massey and Reed had a telephone conversation concerning the impact of the construction on his property. LKQ's offer in the amount of $2,775 included the cost of cleaning the pool's DE filter for ten months, cleaning the pool for ten months, power washing air condition units (which Mr. Reed testified took him five hours), and the cost to replace 200 bales of hay. Tr. 175, lines 17-25 to Tr. 176, lines 1-16; Def.'s Ex. 19. Mr. Massey testified, "I felt like we had an agreement over the phone." Tr. 157, line 25. He testified he left a message for Mr. Reed that a check was available for him to pick up from the contractor. Tr. 176, line 22. He testified that Mr. Reed did not pick up the payment, and the check was never cashed. Tr. 176, line 25. LKQ has not provided evidence that Mr. Reed received the message

regarding the check. Other than Mr. Massey's impression that he and Mr. Reed had reached an agreement over the telephone, there is no evidence that Mr. Reed agreed that the amount of the check was adequate to compensate him for the impact of construction on his use and enjoyment of his property.

36.     On September 2, 2014, the SUP was amended to allow for "cutting and/or removal of parts in the Open Salvage Yard." Def.'s Ex. 10; Tr. 55, lines 16-18. In addition, the requirement that the Open Salvage Yard be "completely" screened from adjacent properties, as contained in the Use Restrictions, *supra*, was amended, with the word "completely" removed. Def.'s Ex. 10. The amended SUP retained the requirement that "The Open Salvage Yard component shall be used only for the storage and cataloging of reclaimed automotive parts and the sale and delivery to wholesale clients only." Def.'s Ex. 10.

**E.     Dust, Debris, Trash, and Noise During Operation of LKQ's Facility**

37.     The Open Salvage Yard at the LKQ facility operates normally from 7:00 a.m. to 6:00 p.m on all days except Sunday. Tr. 68, lines 5-8; Tr. 171, lines 23-25. The warehouse is open until 2:00 a.m., and inside the warehouse the trucks are loaded. Tr. 172, lines 8-10.

38.     The surface of the Open Salvage Yard at the LKQ facility is caliche, also called white chat. Tr. 62, line 25; Tr. 63, lines 1-3. Until June 2017, when LKQ began regularly watering the surface with water trucks, absent rain, the caliche surface was a continuing source of dust on Mr. Reed's property, as vehicles traveled on the caliche surface to and from the LKQ facility, creating clouds of dust which were blown onto Mr. Reed's property by the prevailing winds. Tr. 63, lines 4-10.

39.     Videotapes taken by Plaintiff on his cellular telephone between May 2014 and the date of trial corroborate Mr. Reed's testimony that LKQ's operations produced clouds of dust. The

videotapes show that during operations, LKQ's vehicles traveling on the caliche surface of the Open Salvage Yard kicked up clouds of dust that blew toward Mr. Reed's property. Pl.'s Ex. 21 (IMG 4766; IMG 4747).

40. Because of the dust blowing from the caliche surface onto his property, Mr. Reed testified that he had to pressure wash his house, windows, air conditioner unit, and aerobic waste system filter more often than prior to LKQ's arrival. Tr. 58, lines 1-17.

41. There are alternative sources of dust in the vicinity of Mr. Reed's property. Mr. Massey testified that dust was also produced by construction at a site just south of LKQ, at which an industrial park was being built. Tr. 187, lines 9-25 to Tr. 188, lines 1-21. He testified that construction had been taking place there for more than one year, but less than two years, prior to the date of trial. Tr. 188, lines 20-21. A videotape taken by LKQ in January 2018 shows a minimal amount of dust being produced by the development south of LKQ and blowing onto LKQ's property, not Mr. Reed's. Def.'s Ex. 25. Mr. Reed, on cross-examination, did not dispute that, beginning "about a year give or take" prior to trial and continuing to the time of trial, construction had been taking place at a site south of LKQ. Tr. 104, lines 2-14. He testified, however, that based on his personal observations, he saw the dust about which he was complaining coming off the Open Salvage Yard at the LKQ facility and felt the wind blowing dust from LKQ toward his house. Tr. 105, lines 24-25 to Tr. 106, line 1. He also testified that he believed the surface at the construction site south of LKQ was concrete and not white chat. Tr. 104, lines 23-24. On cross-examination, Mr. Reed also conceded that it was possible that some of the dirt and debris on his property came from sources other than the LKQ facility. Tr. 119, line 9.

42. Mr. and Mrs. Reed both testified that prior to LKQ commencing construction, they had no problems with dust or debris on their property. Tr. 121, lines 11-14; Tr. 126, lines 23-25.

43.     Mr. Reed cannot affirmatively identify the source of the trash he testified blew onto his property, other than through speculation. Tr. 116, lines 1-25 to Tr. 118, lines 1-8.

44.     Mr. Reed can only identify one piece of trash specifically that is related to LKQ in his testimony. Mr. Massey testified that LKQ engages in clean-up of trash that comes from I-35W on a weekly basis. Tr. 196, lines 23-25 to Tr. 197, lines 1-7.

45.     Mr. Reed testified that trash on his property from LKQ may be as infrequent as one time per week. Tr. 59, line 12; Tr. 61, line 7. Sometimes it might be two days per week. Tr. 61, lines 7-8.

46.     Mr. Reed testified that LKQ's operations produced constant noise "every day all day from the moment they open until the time they close in the evening." Tr. 61, lines 18-29.

47.     He testified that the constant noise was coming from three main sources: the sound produced by the mobile car crusher (which was situated in close proximity to his property line for periods of six to eight months at a time); back-up beepers (which were constant during operational hours); and the "horrifying metal screeching sound" of metal being dragged on the property, which he testified was "hit or miss." Tr. 68-69, 73. He further testified that the sound of dragging metal "might be 30 minutes, and it might stop for a couple hours, and it starts again." Tr. 73, lines 9-10. With respect to the noise of the car crusher, he testified that when it was up by his property, the noise produced was constant: "They are loading cars in there all day long, crushing cars, crushing cars, crushing cars, all day long." Tr. 73, lines 11-13. He also testified that when the car crusher was moved away from his property to the back corner of LKQ's property, he could not hear the sound of actual car crushing, but only the hum of the motor which produced a "high-pitched" sound. Tr. 69, lines 19-23.

48.     He testified that the noise from the car crusher, back-up beepers, and metal dragging could be heard inside his home and was loud enough to wake him from sleep. Tr. 68-70.

49.     Mr. Reed testified that, on one occasion, the noise level of the back-up beepers prevented his son from studying at home, and his son was required to leave the home to study elsewhere. Tr. 73, lines 2-3.

50.     Mrs. Reed testified that she no longer sets an alarm clock because the back-up beepers wake her up, and the noise of the back-up beepers, which she can hear inside her home, "is sunup to sundown." Tr. 129, lines 4-11. She further testified that the noise from back-up beepers was constant to the point she has "literally gone a little mad sometimes," and while at the grocery store, she has experienced "a phantom beeping in [her] ear." Tr. 129, lines 17-22.

51.     Mrs. Reed testified that the noise from dragging cars, audible inside and outside the home, "sounds like a sci-fi pterodactyl screaming." Tr. 130, lines 1-2.

52.     Videotapes taken by Plaintiff on his cellular telephone between May 2014 and the date of trial corroborate Mr. and Mrs. Reed's testimony that the noise from LKQ's operations was persistent and loud enough to hear from that point of Mr. Reed's property farthest from the LKQ facility. The noise audible on the videotapes includes the back-up beepers of LKQ's vehicles and the sound of the car crusher when it is positioned near Mr. Reed's property line. Pl.'s Ex. 21 (IMG 4747; IMG 4748; IMG 4762; IMG 4763; IMG 4764). Although the sound of dragging vehicles is not audible in the videotapes, videotape taken by Plaintiff on his cellular telephone shows an LKQ vehicle pushing or carrying an automobile across the Open Salvage Yard toward the car crusher. Pl.'s Ex. 21 (IMG 4762). Further, Mr. and Mrs. Reed provided credible and consistent testimony of the sound produced by dragging metal. Tr. 68-70; Tr. 73; Tr. 130, lines 1-2.

53.     Videotapes taken by Defendant in January 2018 reflect that noise from I-35W is audible on Mr. Reed's property. Def.'s Ex. 26; Def.'s Ex. 27. Mr. Massey also testified that, when standing on Mr. Reed's property, he is able to hear the sound of I-35. Tr. 186, line 1.

54.     Mr. Reed testified that the compressor at the gas well to his east has a sound barrier, and it only produces a light humming sound that does not disturb him. Tr. 71, lines 2-13. Videotapes taken by Plaintiff on his cellular telephone between May 2014 and the date of trial corroborate Mr. Reed's testimony. The sound of the gas well is not audible on the videotapes taken by Plaintiff, but the sounds of the back-up beepers and car crusher are audible. Pl.'s Ex. 21 (IMG 4747; IMG 4748; IMG 4762; IMG 4763; IMG 4764).

55.     Mr. Massey testified that standing on Mr. Reed's property, he is able to hear the sound of the gas well. Tr. 186, lines 1-3. In a videotape taken by Mr. Massey in 2018 (Def.'s Ex. 45), the sound of the gas well is audible. After questioning by the court, Mr. Massey acknowledged that when he took the videotape, he was "standing on the gas site driveway," approximately "150 feet" from the gas wells, and approximately 500 feet from Mr. Reed's home. Tr. 192, lines 17-19; Tr. 193, lines 3-8.

56.     Mr. Massey testified that, following the commencement of operations, LKQ took steps to abate any intrusion that it may have on Mr. Reed's enjoyment of his property. Tr. 173, lines 17-19. These included measuring the noise after receiving noise complaints to ensure compliance (Tr. 173, lines 20-24); watering down the roads used by vehicles several times per day beginning June 26, 2017 (Tr. 200, lines 19-25 and Def.'s Ex. 32); hooding its lights on the side of Mr. Reed's property (Tr. 110, lines 7-13); and moving operations, including the car crusher, away from Mr. Reed's property line, and designating the lane that is the farthest away from his property line as the main drive, directing the majority of its traffic to that lane. Tr. 109, line 25 to Tr. 110,

lines 1-6 and Tr. 174, lines 1-15. Mr. Massey testified that LKQ has had no dust complaints since it began watering down of the roads in June 2017. Tr. 201, lines 7-10; Def.'s Ex. 32.

57.     Pursuant to the SUP, as amended, the only activities allowed in the Open Salvage Yard were storing and cataloging reclaimed automotive parts and cutting and/or removing of parts. Def.'s Ex. 10. The evidence introduced at trial shows that LKQ dragged metal and operated the car crusher in the Open Salvage Yard in violation of the SUP, as amended. Tr. 68, lines 22-25 to Tr. 69, lines 1-24; Tr. 73, lines 9-13; Tr. 130, lines 1-2; Pl.'s Ex. 21.

58.     Mr. Massey testified that LKQ planted trees pursuant to the specifications outlined for it by the City of Burleson to provide a buffer for Mr. Reed's property. Tr. 178-180. He also testified that some of the trees died because of a damaged water line on LKQ's property, and that LKQ has been engaged in re-planting the trees that had died. Tr. 165, lines 1-8; Tr. 174, lines 16-25 to Tr. 175, line 10. Mr. Massey testified that he believes the Open Salvage Yard was screened from Mr. Reed's property. Tr. 166, lines 24-25 to Tr. 167, lines 1-2.

59.     Mr. Reed testified that trees and shrubs planted by LKQ did not screen his property from the LKQ facility and did not meet the requirements of the SUP's landscape buffer plan, which required a ten-foot wide landscape buffer to be installed outside of the screening fence. Tr. 68, line 14; Pl.'s Ex. 20; Pl.'s Ex. 4. Photographs taken by Plaintiff after construction, as well as videotapes taken both by Plaintiff and Defendant, support Mr. Reed's testimony that the trees and shrubs planted by LKQ, many of which died due to LKQ's failure to provide adequate irrigation, did not screen Mr. Reed's property from the LKQ facility, and that the tree and shrub plantings were skimpy. Def.'s Ex. 44; Def.'s Ex. 24; Pl.'s Exs. 17-AA, DD, JJ, KK, MM, NN, OO, QQ, SS; Pl.'s Ex. 21. These same photographs and videotapes contradict Mr. Massey's testimony that the Open Salvage Yard was screened from Mr. Reed's property. Tr. 166, lines 24-25 to Tr. 167, lines 1-2.

60.     In 2014, the Burleson City Council notified LKQ that in constructing its facility, it had failed to comply with a power company's easement for its power lines between Mr. Reed's property and the LKQ facility, and that LKQ's decision to relocate an electrical line violated the SUP, was done without notice to the City, and "effectively undermine[d] the landscape buffer which was approved by the City in the original SUP [] [and] included the planting of trees which would grow to sufficient height to provide screening for adjacent properties." Pl.'s Ex. 9 (LKQ 000059).

61.     Although Mr. Reed asked LKQ to build a thirty-foot fence between its facility and his property, and the City Council did not believe an eight-foot fence could completely screen LKQ's facility from Mr. Reed's property, LKQ chose not to build a fence higher than the minimum eight-foot fence required by the SUP. Tr. 152, lines 15-25 to Tr. 156, line 16.

62.     Mr. Reed has not sought any medical treatment or psychological or emotional counseling for any of the issues related to his claims. Tr. 119, line 24-25 to Tr. 120, line 4.

63.     Mr. Reed testified that LKQ's operations were a burden on him and his family. Tr. 72, lines 5-6.

64.     Mrs. Reed testified that the noise and dust from the LKQ facility have affected the use of enjoyment of her home and property and, were her children one and five today, she would not have bought the house. Tr. 131, lines 10-18.

65.     Mr. Reed testified that LKQ's operations have affected his use of enjoyment of his property. He testified that he could not sit out by his swimming pool because "when you are sitting out by your swimming pool and you are hearing this horrifying metal sound being dragged across the ground, and it is very, very – I can't describe the sound of it, but it is ungodly[,] this sound, and so I want to go inside. You say I am going to go inside." Tr. 72, lines 13-18.

66. Mrs. Reed testified that one of the reasons they purchased the home in Burleson in 2001 was because of the solitude, as it was located out in the country. Tr. 126, lines 1-2.

**F.       The Credibility of the Witnesses**

67. In assessing the testimony of Mr. Reed, Mrs. Reed, and Mr. Massey, the court has considered each witness's demeanor and manner of testifying while on the witness stand; apparent candor and fairness, or the lack thereof; the reasonableness or unreasonableness of each witness's testimony; the opportunity he or she had to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which he or she was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail. *See supra* note 2.

68. Having considered the above-listed factors, the court determines that the testimony of Plaintiff and his wife, Mrs. Reed, was more credible than that of Mr. Massey, the sole witness appearing on behalf of LKQ as its corporate representative. First, Mr. Massey testified he is the plant manager at *four* LKQ facilities in the Dallas-Fort Worth area. Tr. 139, lines 23-24. Although no objection was made to him appearing as a witness for LKQ, common sense compels the obvious reasonable inference that Mr. Massey was not present at the LKQ facility that is the subject of this litigation during all relevant time periods of construction and operation. Accordingly, the court seriously questions the extent of his personal knowledge, pursuant to Federal Rule of Evidence 602, to testify regarding the events transpiring there over a period of time from 2013 through the date of trial. Further, Mr. Massey's testimony that he believes that Mr. Reed's property is screened from LKQ's facility (Tr. 166, lines 24-25 to Tr. 167, lines 1-2), is flatly contradicted by the photographic and videotape evidence admitted at trial, as well as Mr. Reed's testimony. Def.'s Ex.

44; Def.'s Ex. 24; Pl.'s Exs. 17-AA, DD, JJ, KK, MM, NN, OO, QQ, SS; Pl.'s Ex. 21; Tr. 68, line 14.

69.     Additionally, several times during the trial, Mr. Massey appeared hesitant and evasive in his responses, requiring the court to instruct him to answer questions directly. At one juncture, after an extensive colloquy between Mr. Bobo and Mr. Massey, the court was required to interject and admonish Mr. Massey: "Okay, let me just say this. If a question is asked, answer [Mr. Bobo's] question. Do not try to reroute the answer to what you think it should be." Tr. 146, lines 1-3. On another occasion, after observing that Mr. Massey gave inconsistent and unclear responses regarding whether certain trees located between the LKQ facility and Mr. Reed's property appearing in a photograph taken by Plaintiff preexisted LKQ's construction or were planted by LKQ, the court, in response to Mr. Massey's statement that he thought it had been established previously that certain trees were preexisting, stated:

> No, we have not. We have not established that because you are running around the barn [five] or [six] times, and you have not come in. Go ahead and cut to the chase, so I know what is going on here. Frankly speaking, it is becoming a bit frustrating because you are not answering [Mr. Bobo's] questions. This question is direct. You can either answer the question, say I do not know, but do not answer a question the way that you want to. Answer his question. That has not been happening during the course of your testimony.

Tr. 163, lines 4-13.

70.     The testimony of Plaintiff and his wife, Mrs. Reed, was consistent throughout the trial. Plaintiff and his wife did not exhibit any evasiveness, and each clearly had personal knowledge of the events that transpired between 2013 and the date of trial.

**IV.    Conclusions of Law**

    **A.    Applicable Nuisance Law**

As stated by the late Dean William L. Prosser, "[t]here is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.' It has meant all things to all people, and has been applied indiscriminately to everything from an alarming advertisement to a cockroach baked in a pie." W. Page Keeton et al., Prosser and Keeton on Law of Torts § 86, at 616 (5th ed. 1984) ("Prosser and Keeton") (footnotes omitted). "Courts have used it to identify the cause or source of harm, the harm suffered, and the resulting liability." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 587 (Tex. 2016) (citing Restatement (Second) of Torts § 821A cmt. b (Am. Law Inst. 1979)). "The state of the nuisance doctrine some seventy years ago led Dean Prosser to declare nuisance as the law's 'garbage can.'" *Id.* (quoting William L. Prosser, Nuisance Without Fault, 20 Tex. Law Rev. 399, 410 (1942)). Both the Supreme Court of Texas and the United States Supreme Court "have been equally critical." *Id.* at n.1 (collecting cases).

The lack of analysis and seeming inconsistency in dealing with nuisance claims stem, partly, from the historical development of nuisance doctrine; partly, from a failure to clearly define what constitutes a nuisance; and, partly, from differences in describing the kinds of conduct required to support a nuisance claim. Prosser and Keeton § 86, at 617. Agreeing with Dean Prosser's lament that the lack of clear delineation of the circumstances in which the law imposes liability against one who creates a nuisance can lead to confusion, the Supreme Court of Texas in *Crosstex* attempted "to provide a more comprehensive, though certainly not exhaustive, explanation of the circumstances in which Texas law may hold a party liable for causing a private nuisance." 505 S.W.3d at 591.

*Crosstex* explained that the law of "nuisance" seeks to balance a property owner's right to use his property "as he chooses in any lawful way" against his duty not to use it in a way that injures another. *Id.* at 590-91 (citation omitted). It defined "nuisance" as "a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Id.* at 593 (quoting *Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003)).

According to *Crosstex*, a nuisance does not refer to a cause of action "but instead to the particular type of *legal injury* that can support a claim or cause of action seeking legal relief." *Id.* at 594 (emphasis in original). "The law of nuisance recognizes that certain injuries to a person's right to the 'use and enjoyment of property'" can constitute a "form of legal injury for which a legal remedy will be granted." *Id.* at 595.

In *Crosstex*, the court stated that "the condition the defendant causes may interfere with a wide variety of the plaintiffs' interests in the use and enjoyment of their property. It may, for example, cause physical damage to the plaintiffs' property, economic harm to the property's market value, harm to the plaintiffs' health, or psychological harm to the plaintiffs' 'peace of mind' in the use and enjoyment of their property." *Id.* at 596.

To rise to the level of nuisance, however, the interference must satisfy two additional requirements. First, it must be "substantial" in light of all the circumstances. *Id.* at 595. Second, the "discomfort or annoyance" must be objectively "unreasonable." *Id.*

The requirement that the interference must be "substantial" "sets a minimum threshold that confirms that the law does not concern itself with trifles, or seek to remedy all of the petty annoyances and disturbances of every day life in a civilized community even from conduct committed with knowledge that annoyance and inconvenience will result." *Id.* at 595 (internal

quotation marks and citation omitted). According to *Crosstex*, "There is no question that foul odors, dust, noise, and bright lights—*if sufficiently extreme*—may constitute a nuisance." *Id.* at 595 n.8 (quoting *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269 (Tex. 2004) (emphasis supplied by *Crosstex*)). In determining whether the interference is substantial, a court may review whether the use impairs the adjoining property's market value. *Id.* The substantiality test is fact-specific and includes, "for example, the nature and extent of the interference, and how long the interference lasts or how often it recurs." *Id.* at 595-96.

The second requirement is that the "discomfort or annoyance" must be objectively unreasonable, meaning that "the harm resulting from the invasion is severe and greater than the other should be required to bear without compensation." *Id.* at 596 (citation omitted). In *Crosstex*, the court noted that the unreasonableness inquiry focuses on the effect of the conduct, not the conduct itself. *Id.* at 596-99. It also emphasized that the test is an objective one that views the effect from the standpoint of a "person of ordinary sensibilities," *id.* at 596, 599-600. Otherwise stated, to constitute a private nuisance, the effects of a defendant's conduct or land use must be "such as would disturb and annoy persons of ordinary sensibilities, and of ordinary tastes and habits." *Id.* at 599. "It is not enough that plaintiff himself is offended or annoyed if he is peculiarly sensitive." *Id.* at 600. "The standard is what ordinary people, acting reasonably, have a right to demand in the way of health and comfort under all the circumstances." *Id.*

Further, "as is typical with legal inquiries into reasonableness," the court noted that "the determination requires balancing a wide variety of factors, depending on the specific facts." *Id.* at 596. These include:

– the character and nature of the neighborhood, each party's land usage, and social expectations;

– the location of each party's land and the nature of that locality;

–   the extent to which others in the vicinity are engaging in similar conduct in the use of their land;

–   the social utility of each property's usage;

–   the tendency or likelihood that the defendant's conduct will cause interference with the plaintiff's use and enjoyment of their land;

–   the magnitude, extent, degree, frequency, or duration of the interference and resulting harm;

–   the relative capacity of each party to bear the burden of ceasing or mitigating the usage of their land;

–   the timing of each party's conduct or usage that creates the conflict;

–   the defendant's motive in causing the interference; and

–   the interests of the community and the public at large.

*Id.* at 600 (citations omitted) (the "*Crosstex* factors"). "Whether an interference is substantial or the effects of the interference unreasonable in any given case necessarily depends on these and potentially other factors." *Id.* All of these factors must be "thrown into the scale," and the decision must be made based on what is reasonable under the circumstances. *Id.* (citation omitted).[9]

Finally, *Crosstex* set forth three classifications for private nuisance: intentional nuisance, negligent nuisance, and strict-liability nuisance. *Id.* at 602, 604-609. The court first addresses the standard for intentional nuisance followed by negligent nuisance. The court previously entered

_____

[9] The court's survey of private nuisance cases under Texas law reflects that they typically involve invading a plaintiff's property by light, sound, odor, or a foreign substance, including flooding the plaintiff's land after engaging in construction that altered the flow of a nearby creek, *see, e.g., Barnes v. Mathis*, 353 S.W.3d 760, 763-64 (Tex. 2011); emitting noxious odors that permeated the plaintiff's land*, see, e.g., Natural Gas Pipeline Co. of Am. v. Justiss,* 397 S.W.3d 150, 154 (Tex. 2012); discharging water onto the plaintiff's land, *see, e.g., Tennessee Gas Transmission Co. v. Fromme*, 153 Tex. 352, 269 S.W.2d 336, 338 (Tex. 1954); or invading the plaintiff's land with dust, noise, or bright lights, *see, e.g., Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269-70 (Tex. 2004); *Justiss*, 397 S.W.3d at 154.

judgment as a matter of law in LKQ's favor on Plaintiff's strict liability nuisance claim. *See* Mem. Op. & Order (Doc. 44).

For an intentional nuisance claim, a plaintiff may establish intent with proof that the defendant acted with a specific intent to inflict injury or a malicious desire to so harm by causing the actionable interference. *Crosstex*, 505 S.W.3d at 605. "But an intent to inflict injury or desire to harm is not required to show intent; the plaintiff can establish intent with evidence that the defendant acted with the belief that the interference was 'substantially certain to result from' the defendant's conduct." *Id.* (quoting *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex. 1985)). An intentional invasion may be "an invasion that the actor knowingly causes in the pursuit of a laudable enterprise without any desire to cause harm." *Id.* (quoting Restatement (Second) of Torts § 8A cmt. b). As summarized by Dean Prosser:

> Occasionally, the defendant may act from a malicious desire to so harm for its own sake; but more often the situation involving a private nuisance is one where the invasion is intentional *merely in the sense that the defendant has created or continued the condition causing the interference with full knowledge that the harm to the plaintiff's interests are occurring or are substantially certain to follow*. Thus, a defendant who continues to spray chemicals into the air after he is notified that they are blown onto the plaintiff's land is to be regarded as intending that result, and the same is true when he knows that he is contaminating the plaintiff's water supply with his slag refuse, or that blown sand from the land he is improving is ruining the paint on the plaintiff's house. If the interference is unreasonable, it is tortious and subjects him to liability.

Prosser and Keeton § 86, at 624-25 (emphasis added).

A plaintiff's negligent nuisance claim is governed by ordinary negligence principles, and a plaintiff must prove "the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *Crosstex,* 505 S.W.3d at 607 (internal quotation marks omitted). A negligent nuisance may result from "a failure to take precautions against a risk apparent to a reasonable man." *Id.* (internal quotation marks omitted). "Whether a duty exists is a threshold

inquiry and a question of law; liability cannot be imposed if no duty exists." *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006). A property owner has a duty not to use his property in a way that injures another. *Crosstex*, 505 S.W.3d at 591 (citation omitted); *see also id.* at 614 ("In the conduct of one's business or in the use and exploitation of one's property, the law imposes upon all persons the duty to use ordinary care to avoid injury or damage to the property of others.") (citation omitted). When breach of that duty substantially interferes with use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities, it has caused a nuisance. *Id.* at 600.

### B. Conclusions Regarding Liability

### 1. Mr. Reed's Intentional Nuisance Claim Based on Dust and Debris

The court makes the following conclusions of law concerning Mr. Reed's intentional nuisance claims based on dust and debris from the LKQ facility.

Mr. Massey admitted or acknowledged in a May 9, 2014 e-mail sent to Mr. Reed that LKQ's construction created a "nuisance[] for surrounding properties," and that issues about which Mr. Reed complained—including the dust and debris on his property, in the pool, in the air conditioner units, and destruction of bales of hay—were "directly related to construction[.]" Pl.'s Ex. 25. Mr. Massey's admission is binding on LKQ, as Mr. Massey was LKQ's corporate representative and spoke on behalf of LKQ in his May 9, 2014 e-mail. *See Johnson v. Big Lots Stores, Inc.*, 2008 WL 6928161, at *2 (E.D. La. May 2, 2008) ("[S]tatements by corporate designees under Rule 30(b)(6) are binding on a corporate party because the corporation, by making the designation, 'represents that the employee has authority to speak on behalf of the corporation.'") (quoting *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006)). Although it is a general rule that "such testimony does not constitute a 'judicial admission' which

decides an issue with finality or estops a party from contradicting the testimony of an earlier corporate representative," the only evidence adduced at trial was Mr. Massey's conflicting testimony that he did not have an opinion as to whether the conditions created by LKQ during construction constituted a nuisance. Tr. 140, line 25. In any event, even if Mr. Massey's statement is not an admission of a party opponent, the statement is one that the court may consider in assessing the credibility of a witness.

In addition to Mr. Massey's acknowledgment in his May 9, 2014 e-mail that LKQ's construction created a nuisance affecting surrounding properties, for the reasons that follow, the court concludes that Mr. Reed has shown by a preponderance of the evidence that LKQ's construction and operation created dust and debris that substantially interfered with his use and enjoyment of his land by causing him unreasonable discomfort or annoyance.

Mr. Reed has proved by a preponderance of the evidence that, beginning with construction in the fall of 2013, and continuing until it began watering down the caliche surfaces of the Open Salvage Yard on or about June 26, 2017, dust caused by LKQ's construction and operations blew onto his property. With respect to debris, Mr. Reed has proved by a preponderance of the evidence that, beginning with construction in the fall of 2013, and continuing until construction ended in approximately May of 2014, debris caused by LKQ's construction blew onto his property. The evidence includes, without limitation, the following:

For the time period of construction from the fall of 2013 to approximately May 2014, photographs taken by Mr. Reed show a copious amount of dust and debris on his property. Pl.'s Exs. 17-F through 17-V. Mr. Reed testified that in preparing the site, LKQ dragged and scraped the land, and "dirt was kicking up into the air. It was unreal. It was getting as high as the clouds." Tr. 35, lines 22-24. Mr. Reed testified, "I had trash and debris blowing all over my property, and

I had tons of styrofoam blowing onto my property." Tr. 36, lines 24-25 to Tr. 37, line 1.[10] Mr. Reed also testified that the prevailing wind in the area of his property blows from south to north. Tr. 41, line 8. In addition to Mr. Reed's testimony at trial, pursuant to Federal Rule of Evidence 201(b), the court took judicial notice that the prevailing wind in the area was south to north. *See* Finding of Fact No. 8. Mr. Reed's property is north of the LKQ facility. Tr. 19, lines 19-20; Pl.'s Ex. 1A. From this evidence, the court concludes that the dust and debris generated by LKQ's construction blew from the LKQ facility onto Mr. Reed's property.

Following completion of construction, from approximately May 2014 until on or about June 26, 2017—when LKQ began regularly watering down the caliche road surfaces in the Open Salvage Yard (Def.'s Ex. 32)—Mr. Reed testified that LKQ's operations were a constant source of dust blown onto his property by the prevailing winds. Tr. 63, lines 4-10. The Open Salvage Yard at the LKQ facility operates normally from 7:00 a.m. to 6:00 p.m on all days except Sunday. Tr. 68, lines 5-8; Tr. 171, lines 23-25. Videotapes taken by Plaintiff on his cellular telephone corroborate his testimony that LKQ's operations, and specifically its vehicles travelling on the caliche surface of the Open Salvage Yard, produced clouds of dust that blew onto his property. Pl.'s Ex. 21 (IMG 4766; IMG 4747). Photographs taken by Plaintiff also show that LKQ's operations produced large clouds of dust which, given the prevailing winds, accumulated on his property. Pl.'s Ex. 17-BB, DD, FF.

Mr. Reed has proved by a preponderance of the evidence that the nature, duration, and amount of dust and debris on his property from LKQ's construction and operation substantially interfered with his use and enjoyment of his property for its intended purpose by causing

---

[10] Although Mr. Reed uses the word "tons" in describing the amount of styrofoam, the court does not take this to mean that he literally had thousands and thousands of pounds of styrofoam. The court interprets this to mean that there was a significant amount to cause him discomfort or annoyance.

unreasonable discomfort and annoyance.  As set forth directly above, the evidence shows that the dust and debris from LKQ's construction and operation began in the fall of 2013 and continued for approximately four years, until approximately June 26, 2017, when water logs show that LKQ began regularly watering down the caliche surfaces. *See* Def.'s Ex. 32. With respect to the amount of dust, since the construction began, Mr. Reed testified that his home, windows, patio, patio furniture, outdoor grill, and vegetation were frequently covered with a thick layer of dust. Tr. 36, lines 23-24; Tr. 41, line 8. Mr. Reed testified that styrofoam shavings and dust from LKQ filled his pool and blocked the DE filters during LKQ's construction. Tr. 37, lines 1-18. Although he previously cleaned the pool's DE filters twice yearly, because of the sheer amount of dust generated by the construction, he was required to clean them much more often than previously, and he was required to clean the styrofoam debris from the pool daily. Tr. 38, lines 4-11. Mr. Reed testified that a week after he cleaned the DE filters, it "looked like a sand storm had come through," requiring him to clean them again. Tr. 38, lines 7-8. When he vacuumed the pool, the dust and debris clogged the DE filters, and he would be forced to clean them again. Tr. 39, lines 3-16. Mr. Reed testified that because of the amount of dust blowing from the caliche surfaces onto his property, he had to pressure wash his house, windows, air conditioner unit, and aerobic waste system more often than previously. Tr. 58, lines 1-17. Mrs. Reed testified that during the construction phase, so much debris was blowing from LKQ's property onto the Reed's property that "it was like snowing styrofoam." Tr. 128, line 6. Photographic and videotape evidence cited directly above corroborates Mr. and Mrs. Reed's testimony and shows that the dust and debris generated by LKQ's construction and operation that blew onto Mr. Reed's property was substantial and of long duration. Pl.'s Ex. 21 (IMG 4766; IMG 4747); Pl.'s Ex. 17-BB, DD, FF.

While Mr. Massey testified that others in the vicinity of Mr. Reed's home may have engaged in activities that also produced dust, and Mr. Reed conceded that some of the dust on his property may have come from others, based on Mr. Reed's testimony, Mrs. Reed's testimony, Mr. Massey's acknowledgment in his May 9, 2014 e-mail to Mr. Reed that LKQ caused the dust and debris (Pl.'s Ex. 25), photographs and videotapes, and the direction of the prevailing winds blowing from LKQ's facility toward Mr. Reed's property, *supra*, the court concludes that any dust generated by others in the vicinity of Mr. Reed's property was not a significant cause of dust on Mr. Reed's property. In addition, Mr. and Mrs. Reed both testified that prior to LKQ commencing construction, they had no problems with dust or debris on their property. Tr. 121, lines 11-14; Tr. 126, lines 23-25.

It is undisputed that Mr. Reed notified LKQ repeatedly of the dust and debris accumulating on his property from construction and operation of its facility, and that he raised the topic at several city council meetings, even in advance of the commencement of construction. Tr. 38, lines 15-16; Tr. 42, lines 1-6; Tr. 44, lines 8-15; Tr. 45, lines 3-17; Pl.'s Exs. 1-6; Pl.'s Ex. 16; Pl.'s Ex. 25.

Mr. Reed has proved by a preponderance of the evidence that LKQ, having notice of the dust and debris blowing onto his property, created or continued to generate the dust and debris with knowledge that the harm to Mr. Reed's interests was occurring or substantially certain to result from the construction and operation of its facility. Until LKQ began regularly watering down the caliche surfaces in the Open Salvage Yard on or about June 26, 2017, *see* Def.'s Ex. 32, the evidence detailed above shows that the dust from its operations continued to blow onto Mr. Reed's property. Mr. Reed also testified that during construction, LKQ made "no attempt to try to stop the dust from coming up. They just kept going about their business of what they were trying to accomplish." Tr. 42, lines 13-16.

Mr. Reed has proved by a preponderance of the evidence that the effects of LKQ's substantial interference with his use and enjoyment of his property caused by dust and debris were unreasonable. From the evidence set forth in detail above, the court concludes that the harm resulting from the dust and debris "is severe and greater than the other should be required to bear without compensation." *Crosstex*, 505 S.W.3d at 596 (citation omitted). In reaching this conclusion, the court has considered evidence pertaining to the *Crosstex* factors. The court has already examined numerous of the *Crosstex* factors, including the nature of LKQ's interference with Mr. Reed's property, and the magnitude, extent, degree, frequency and duration of the conduct. With respect to the character and nature of the neighborhood, the evidence shows that the land was originally zoned agricultural, and the property across from Mr. Reed's home was rural with hay fields until LKQ was granted a zoning change in 2013. Tr. 21, lines 17-20. The zoning was changed from "agricultural" to "industrial" to enable the development of LKQ's automobile reclamation facility, and an SUP was granted to allow LKQ to operate. Pl.'s Ex. 2; Pl.'s Ex. 16. While there are other commercial entities that have sprung up in the vicinity of Mr. Reed's home since he purchased it in 2001, there is no evidence of any business enterprise that is of the same scope or type as LKQ's. Further, with regard to the relative capacity of each party to bear the burden of ceasing or mitigating the usage of its land, the evidence before the court shows that LKQ is a multinational corporation and has the resources to create barriers to eliminate or significantly lessen the nuisances of which Mr. Reed complains, while Mr. Reed does not have the capacity to fix or eliminate the problem, absent selling his property and moving. Additionally, LKQ's motive in causing the interference is financial gain. Further, the social utility of an automobile reclamation facility (especially given that three other such facilities are located in the Dallas-Fort Worth area) does not vitiate the long-revered right to the use and enjoyment of one's home.

Moreover, the court concludes that LKQ's possession of an SUP does not insulate it from liability for nuisance. "Even if a commercial enterprise holds a valid permit to conduct a particular business, the manner in which it performs its activity may give rise to an action for nuisance." *C.C. Carlton Indus., Ltd. v. Blanchard*, 311 S.W.3d 654, 656 (Tex. App.—Austin 2010, no pet.) (citation omitted); *see also Manchester Terminal Corp. v. Texas TX TX Marine Transp., Inc.*, 781 S.W.2d 646, 650 (Tex. App—Houston [1st Dist.], 1989, writ denied) (citation omitted) ("Even if a commercial enterprise holds a valid statutory permit to conduct a particular business, the manner in which it performs the activity may give rise to an action for injunctive relief or damages.").

For these reasons, the court concludes that Mr. Reed has proved by a preponderance of the evidence all of the necessary elements of his intentional nuisance claim based on dust and debris from LKQ's construction and operation. Accordingly, he is entitled to damages.

## 2. Intentional Nuisance Claim Based on Trash and Floodlights from LKQ's Facility

The court makes the following conclusions of law concerning Mr. Reed's intentional nuisance claim arising from trash from LKQ's facility.

Mr. Reed has proved by a preponderance of the evidence that some trash from LKQ's construction and operation accumulated on his property; however, he cannot affirmatively identify the source of most of the trash on his property other than through speculation. Tr. 116, lines 1-25 to Tr. 118, lines 1-8. In his testimony, Mr. Reed can only identify one piece of trash specifically that is related to LKQ, and trash on his property may appear as infrequently as one time per week. Tr. 59, line 12; Tr. 61, line 7. Mr. Reed testified that for a period of one or two nights during construction, LKQ used floodlights that "lit up" his home. Tr. 42, lines 9-14.

Mr. Reed has failed to prove by a preponderance of the evidence that any harm to his property caused by the trash and floodlights was more than a slight inconvenience or petty

annoyance. As previously stated, "The law does not concern itself with trifles, or seek to remedy all of the petty annoyances and disturbances of every day life in a civilized community even from conduct committed with knowledge that annoyance and inconvenience will result." *Crosstex*, 505 S.W.3d at 595 (internal quotation marks and citation omitted). Accordingly, Mr. Reed has failed to prove by a preponderance of the evidence all necessary elements of an intentional nuisance claim based on trash and floodlights from LKQ.

### 3. Intentional Nuisance Claim Based on Noise from LKQ's Facility

The court makes the following conclusions of law concerning Mr. Reed's intentional nuisance claim based on noise from LKQ's facility.

Mr. Reed has proved by a preponderance of the evidence that noise from LKQ's construction and operation reached his property, and that the nature, duration, and amount of noise from LKQ's construction and operation substantially interfered with his use and enjoyment of his property for its intended purpose by causing unreasonable discomfort and annoyance. The evidence supporting this conclusion includes the following:

Mr. Reed testified that LKQ's operations produced constant noise "every day all day from the moment they open until the time they close in the evening." Tr. 61, lines 18-29.  He testified that the constant noise was coming from three main sources: the sound produced by the mobile car crusher (which was situated in close proximity to his property line for periods of six to eight months at a time); back-up beepers (which are constant during operational hours); and the "horrifying metal screeching sound" of metal being dragged on the property, which he testified was "hit or miss." Tr. 68-69, 73. He further testified that the sound of dragging metal "might be 30 minutes, and it might stop for a couple hours, and it starts again." Tr. 73, lines 9-10. With respect to the noise of the car crusher, he testified that when it was up by his property, the noise

produced was constant: "They are loading cars in there all day long, crushing cars, crushing cars, crushing cars, all day long." Tr. 73, lines 11-13. He also testified that when the car crusher was moved away from his property to the back corner of LKQ's property, he could not hear the sound of actual car crushing, but only the hum of the motor which produced a "high-pitched" sound. Tr. 69, lines 19-23.

Mr. Reed also testified that the noise from the car crusher, back-up beepers, and metal dragging could be heard inside his home and was loud enough to wake him from sleep. Tr. 68-70. He testified that, on one occasion, the noise level of the back-up beepers prevented his son from studying at home, and his son was required to leave the home to study elsewhere. Tr. 73, lines 2-3. He also testified to an instance during which the back-up beepers malfunctioned and continued throughout the entire night. Tr. 43-44.

Mrs. Reed's testimony is consistent with Mr. Reed's. She testified that she no longer sets an alarm clock because the back-up beepers wake her up, and the noise of the back-up beepers, which she can hear inside her home, "is sunup to sundown." Tr. 129, lines 4-11. She further testified that the noise from back-up beepers was constant to the point she has "literally gone a little mad sometimes," and while at the grocery store, she has experienced "a phantom beeping in [her] ear." Tr. 129, lines 17-22. Mrs. Reed also testified that the noise from dragging cars, audible inside and outside the home, "sounds like a sci-fi pterodactyl screaming." Tr. 130, lines 1-2.

Videotapes taken by Plaintiff on his cellular telephone between May 2014 and the date of trial corroborate Mr. and Mrs. Reed's testimony that the noise from LKQ's operations was persistent and loud enough to hear from that point of Mr. Reed's property farthest from the LKQ facility. The noise audible on the videotapes includes the back-up beepers of LKQ's vehicles and the sound of the car crusher when it is positioned near Mr. Reed's property line. Pl.'s Ex. 21 (IMG

4747; IMG 4748; IMG 4762; IMG 4763; IMG 4764). Although the sound of dragging vehicles is not audible in the videotapes, videotape taken by Plaintiff on his cellular telephone shows an LKQ vehicle pushing or carrying an automobile across the Open Salvage Yard toward the car crusher. Pl.'s Ex. 21 (IMG 4762). Further, Mr. and Mrs. Reed provided credible and consistent testimony of the sound produced by dragging metal. Tr. 68-70; Tr. 73; Tr. 130, lines 1-2.

While LKQ produced some evidence that noise on Mr. Reed's property was caused by nearby roads and other activities in the vicinity of Mr. Reed's home, based on Mr. Reed's testimony, Mrs. Reed's testimony, Mr. Massey's testimony, videotapes, and the direction of the prevailing winds blowing from LKQ's facility toward Mr. Reed's property, *see supra*, the court concludes that, with the exception of the sound of I-35W and the gas well, which Mr. Reed testified did not disturb him, the primary source of noise audible on Mr. Reed's property and in his home emanated from LKQ's operations in the Open Salvage Yard, including the constant sound of back-up beepers during hours of operation, the sound of the car crusher, and the sound of scraping metal. *See* Finding of Fact No. 55.

It is undisputed that Mr. Reed notified LKQ repeatedly of the noise generated by the construction and operation of its facility. Mr. Reed has proved by a preponderance of the evidence that LKQ, having notice of the noise, created or continued to generate noise with knowledge that the harm to Mr. Reed's interests were occurring or substantially certain to result from the noise. Pl.'s Ex. 21 (IMG 4747; IMG 4748; IMG 4762; IMG 4763; IMG 4764);Tr. 68-70; Tr. 73; Tr. 130, lines 1-2. In addition, pursuant to the SUP, as amended, the only activities allowed in the Open Salvage Yard were storing and cataloging reclaimed automotive parts and cutting and/or removing of parts. Def.'s Ex. 10. The evidence introduced at trial shows that, despite the limitations in the amended SUP, LKQ dragged metal and operated a car crusher in the Open Salvage Yard from the

commencement of operations in the summer of 2014 to the date of trial. Tr. 68, lines 22-25 to Tr. 69, lines 1-24; Tr. 73, lines 9-13; Tr. 130, lines 1-2; Pl.'s Ex. 21.

Mr. Reed has proved by a preponderance of the evidence that the effects of LKQ's substantial interference with his use and enjoyment of his property caused by noise were unreasonable. From the evidence set forth in detail above, the court concludes that the harm resulting from the noise "is severe and greater than the other should be required to bear without compensation." *Crosstex*, 505 S.W.3d at 596 (citation omitted). In reaching this conclusion, the court has considered evidence pertaining to the *Crosstex* factors. The court has already examined numerous *Crosstex* factors, including the nature of LKQ's interference with Mr. Reed's property, and the magnitude, extent, degree, frequency and duration of the noise. With respect to the character and nature of the neighborhood, the evidence shows that the land was originally zoned agricultural, and the property across from Mr. Reed's home was rural with hay fields until the zoning was changed from "agricultural" to "industrial" to enable the construction of LKQ's automobile reclamation facility. Tr. 21, lines 17-20; Pl.'s Ex. 2; Pl.'s Ex. 16. While there are other commercial entities that have sprung up in the vicinity of Mr. Reed's home since he purchased it in 2001, there is no evidence of any business enterprise that is of the same scope or type as LKQ's. Further, with regard to the relative capacity of each party to bear the burden of ceasing or mitigating the usage of its land, the evidence before the court shows that LKQ is a multinational corporation and has the resources to significantly lessen the noise of which Mr. Reed complains, while Mr. Reed does not have the capacity to fix or eliminate the problem, absent selling his home and moving. Additionally, as already stated above in the court's analysis of whether the effect of the dust and debris blown from LKQ's construction and operation onto Mr. Reed's property was unreasonable, LKQ's motive in causing the interference is financial gain and the social utility of

an automotive reclamation facility (especially given that three other such facilities are located in the Dallas-Fort Worth area) does not vitiate the long-revered right to the use and enjoyment of one's home.

Mr. Reed has proved by a preponderance of the evidence all of the necessary elements of his intentional nuisance claim based on noise from LKQ's construction and operation of its facility. Accordingly, he is entitled to damages.

### 4. Negligent Nuisance Claim

Mr. Reed has failed prove a negligently-created private nuisance. A plaintiff's negligent nuisance claim is governed by ordinary negligence principles, and a plaintiff must prove "the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *Crosstex,* 505 S.W.3d at 607 (internal quotation marks omitted). A negligent nuisance may result from "a failure to take precautions against a risk apparent to a reasonable man." *Id.* (internal quotation marks omitted). "Whether a duty exists is a threshold inquiry and a question of law; liability cannot be imposed if no duty exists." *Kroger Co.*, 197 S.W.3d at 794. A property owner has a duty not to use his property in a way that injures another. *Crosstex*, 505 S.W.3d at 591 (citation omitted); *see also id.* at 614 ("In the conduct of one's business or in the use and exploitation of one's property, the law imposes upon all persons the duty to use ordinary care to avoid injury or damage to the property of others.") (citation omitted). When breach of that duty substantially interferes with use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities, it has caused a nuisance. *Id.* at 600.

Reed's only contention in the Joint Pretrial Order regarding a duty, or breach of a duty, is that LKQ has not fulfilled its promise to plant trees and build a fence that would protect his home and property from activities conducted by LKQ. Joint Pretrial Order 1 (Doc. 69). "It is a well-

settled ruled that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial." *Kona Tech. Corp. v. Southern Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000) (citations omitted). "If a claim or issue is omitted from the order, it is waived, even if it appeared in the complaint." *Id.* (citations omitted). Once the pretrial order is entered, it "controls the course of the action unless the court modifies it." Fed. R. Civ. P. 16(d). As LKQ correctly notes, LKQ's agreement to plant trees and build a fence was with the City of Burleson and not Mr. Reed. Mr. Reed has failed to demonstrate that he has standing to raise a breach of the SUP and assert a claim for negligence on behalf of the City of Burleson. Accordingly, the court will dismiss his negligent nuisance claim.

### C.       Conclusions Regarding Damages and Equitable Relief

Having concluded that LKQ is liable on Mr. Reed's intentional nuisance claim, thereby entitling him to damages, the court now turns to the amount of damages, if any, to which Mr. Reed has shown himself to be entitled. Damages in a private nuisance case are difficult to quantify; however, this difficulty does not absolve the court of its duty to assess and determine damages when there is a finding of liability, as in this case. As with all cases, the computation and award of damages need not be made with mathematical precision.

### 1.       Actual Damages

The court concludes that Mr. Reed is entitled to monetary compensation for property damage and "psychological harm to [his] 'peace of mind' in the use and enjoyment of [his] property," *see Crosstex*, 505 S.W.3d at 596, caused by dust blowing onto his property from LKQ's construction and operation for the time period beginning the fall of 2013, and continuing through approximately June 26, 2017, when evidence introduced at trial shows that LKQ began to use a

water truck regularly to water down the caliche surfaces in the Open Salvage Yard, thereby abating the dust blowing from the LKQ facility onto Mr. Reed's property. *See* Def.'s Ex. 32.

The court concludes that Mr. Reed is entitled to monetary compensation for property damage and "psychological harm to [his] 'peace of mind' in the use and enjoyment of [his] property," *see Crosstex*, 505 S.W.3d at 596, caused by debris blowing onto his property from LKQ's construction that began in the fall of 2013 and continued until approximately May of 2014, when construction of LKQ's facility was completed.

The court concludes that Mr. Reed is entitled to monetary compensation for "psychological harm to [his] 'peace of mind' in the use and enjoyment of [his] property," *id.*, caused by noise generated by LKQ's construction and operation that began in the fall of 2013 and continued through the date of trial.

The court further concludes that the nuisance in this case is a temporary nuisance.[11] The evidence marshaled by Mr. Reed is insufficient to establish a continuing nuisance. When the nuisance is temporary, the claimant may recover "only such damages as have accrued up to the institution of the suit or (under our system) to the trial of the action." *Id.* at 610 (quoting *Baugh v. Tex. & N.O.R. Co.,* 80 Texas 56, 15 S.W. 587, 587-88 (Tex. 1891)). Mr. Reed may recover the depreciation in the rental or use value of the property, amounts for the cost of repair or restoration of his property caused by the dust and debris accumulating on his property from LKQ's construction and operation, as well as damages for his personal discomfort arising from the nuisance. *See* Prosser and Keeton, § 89, at 638-39.

---

[11] Although the court has concluded that the evidence presented at trial was insufficient to demonstrate a continuing nuisance, nothing in this decision prevents Mr. Reed from filing another lawsuit in the event of new invasions of his interest in the use and enjoyment of his property by LKQ.

Mr. Reed has introduced no evidence of depreciation in the value of his property from 2013, when construction began, through the date of trial. In determining the amount of damages to which Mr. Reed is entitled, however, the court considers the evidence he did introduce of impairment and interference with his use and enjoyment of his property caused by the dust, debris, and noise, including, without limitation, his inability to use and enjoy his outdoor property, including use of the pool or patio for his family and entertainment of guests; the interference with his ability to use his work shed; the loss of hay bales; the labor and cost of cleaning away the dust and debris from his pool on a regular basis, including cleaning the DE filters more than previously; the labor and cost of power washing his home, windows, and air condition units; and the amount necessary to compensate him for "psychological harm to [his] 'peace of mind' in the use and enjoyment of [his] property." *See Crosstex*, 505 S.W.3d at 596.

Evidence at trial was introduced by LKQ that for harm to his property caused by its construction, the sum of $2,775 would adequately compensate Mr. Reed for the cost of cleaning the pool's DE filter for ten months, cleaning the pool for ten months, power washing air condition units (which Mr. Reed testified took him five hours), and for 200 bales of hay. Tr. 175, lines 17-25 to Tr. 176, lines 1-16; Def.'s Ex. 19. Mr. Reed did not introduce any evidence at trial of a different monetary amount to compensate him for these items. Accordingly, the court will use the amount offered by LKQ for these injuries caused by the nuisance it created (*see* Pl.'s Ex. 25), and award Mr. Reed the sum of $2,775 for the cost of repair or restoration of his property caused by the dust and debris accumulating on his property from LKQ's construction beginning in the fall of 2013 and ending in approximately May of 2014. In addition, the court concludes that an additional sum of $2,775 would fairly compensate Mr. Reed for the cost of repair and restoration of his property caused by the dust accumulating on his property from the time LKQ began operations in

approximately June of 2014, through June 26, 2017, when it began watering down the caliche roads, abating the dust problem. Although Mr. Reed did not provide evidence of his monetary damages related to the dust blowing onto his property during LKQ's operations, given the duration and nature of the harm (lasting approximately three years), the court concludes that, at a minimum, his damages exceed the sum of $2,775 that LKQ calculated as appropriate for damages during construction which lasted from the fall of 2013 to approximately May of 2014, a much shorter period of time.

With respect to mental anguish damages, under Texas law, to show an entitlement to mental anguish damages, a plaintiff must put on evidence showing "the nature, duration, and severity of [his]mental anguish, thus establishing a substantial disruption in [his] daily routine," or showing "a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *McCaig v. Wells Fargo Bank (Texas), N.A.*, 788 F.3d 463, 482 (5th Cir. 2015) (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (internal quotation marks and citation omitted)). A plaintiff is not required to show the mental anguish resulted in physical symptoms. *Id.* (citing *Parkway*, 901 S.W.2d at 443).

Based on Mr. Reed's testimony, Mrs. Reed's testimony, Mr. Massey's statements in his May 9 2014 e-mail to Mr. Reed (*see* Pl.'s Ex. 25), photographs and videotapes admitted into evidence, and evidence of the nature, duration, and extent of LKQ's encroachment on Mr. Reed's property during both construction and operation, the court will also award Mr. Reed the sum of $175,000 for mental anguish damages, which the court also describes as "emotional harm" or "psychological harm to [his] 'peace of mind' in the use and enjoyment of [his] property," *see* *Crosstex*, 505 S.W.3d at 596, caused by the relentless sound of back-up beepers, scraping metal, and the car crusher, as well as the dust and debris emanating from LKQ's facility.

In calculating the amount of damages, the court finds instructive the case of *GTE Mobilnet of South Texas Limited Partnership v. Pascouet*, 61 S.W.3d 599 (Tex. App.—Houston [14th Dist] 2001, pet. denied). In *Pascouet*, a husband and wife who were property owners (the "Pascouets") brought a nuisance action against GTE Mobilnet of South Texas Limited Partnership ("GTE"), after it erected a 126 foot tall cellular telephone tower ("Tower") and equipment building ("Building") twenty feet from their property line and sixty feet from their home. The Pascouets testified they moved from France to Houston, Texas, and ultimately decided to settle in the City of Bunker Hill Village because they were attracted by the peaceful environment and strict zoning ordinances. *Pascouet*, 61 S.W.3d at 606. The Pascouets testified that noise and bright lights in their backyard created by the construction of the Tower and Building, as well as GTE workers looking into their backyard, substantially interfered with their use and enjoyment of their backyard and home, thereby constituting a nuisance. On the basis of their testimony, the jury found the Tower and Building constituted a nuisance and awarded the Pascouets $28,000 for loss of the market value of their home (which they had purchased for $400,000), and $180,000 for past loss of use and enjoyment of their property. GTE challenged the award of $180,000 for past loss and use of enjoyment of the property on the basis of insufficient evidence and the purported failure by the Pascouets to prove physical damage to their property. The appellate court disagreed with GTE, characterized its "view of nuisance liability" as "too narrow[,]" *id.* at 614, and affirmed the jury's award of $180,000, noting that "[i]n nuisance law, loss-of-use-and-enjoyment damages compensate claimants for their personal discomfort, annoyance, and inconvenience." *Id.* at 616 (citing *Daniel v. Fort Worth & R.G. Ry. Co.*, 96 Tex. 327, 72 S.W. 578, 579-80 (1903)).

The appellate court summarized the testimony of the Pascouets that supported the award of $180,000 to compensate them for their personal discomfort, annoyance, and inconvenience:

The Pascouets testified that the Tower and Building significantly disturbed their once-tranquil lifestyle that included gardening, socializing, dining, and lounging in their backyard. After GTE constructed the Tower and the Building, the Pascouets spent much less time in their backyard than they did before. Mr. Pascouet no longer enjoyed being in his backyard as much as he used to. The bright lights were on every night after sunset until the early morning, lighting up the Pascouets' backyard. Two air conditioners by the Building and proximate to the Pascouets' property alternated running all the time, producing a loud noise that drowned out normal conversation in the backyard. These air conditioners often disturbed the Pascouets' sleep. Mrs. Pascouet testified that she spent a lot of time in the house and that the nuisance caused by the Tower and the Building caused her distress, made her cry, and made her not interested in living in her house any more. The Pascouets testified that they went from about ten years of an idyllic home life to wanting to flee the home they loved.

*Id.* at 616.

Here, similarly, Mr. Reed testified that in 2001, he purchased the home and adjoining land because he enjoyed spending time outdoors. Mrs. Reed testified that the Reeds chose the property because it was located out in the country and had solitude  Mr. Reed testified that, beginning with construction in the fall of 2013 and continuing to the time of trial, because of the noise and dust produced by LKQ, he no longer enjoyed the outside areas of his home and stayed inside. He also testified that during construction, floodlights from LKQ "lit up" his back yard and the interior of his home. He testified that during LKQ's construction, his pool was covered with dust, and he could no longer entertain friends around the pool or spend time with his family around the pool. In addition, Mr. and Mrs. Reed testified that the noise produced by LKQ was constant during its hours of operation and interfered with their ability to enjoy their home and woke them from their sleep. The noise also interfered with their son's ability to study at the home. Although *Pascouet* involved two plaintiffs and this case involves only one plaintiff, given the duration and severity of the nuisance, which lasted longer and was of a more severe nature than that in *Pascouet*, an award of damages in the amount of $175,000 is reasonable for Mr. Reed's annoyance, discomfort, and inconvenience.

Further, although Mr. Reed did not present expert testimony that he suffered psychological harm, the court concludes that the evidence of record supports an award of this sum, as evidence, including his testimony and that of Mrs. Reed, shows a substantial disruption in Mr. Reed's daily routine and a high degree of mental distress that is more than mere worry or vexation. *See McCaig v. Wells Fargo Bank (Texas), N.A.*, 788 F.3d 463, 482 (5th Cir. 2015) (quoting *Parkway*, 901 S.W.2d at 444 ("Expert testimony is not required to show compensable mental anguish, which may be prove[d] by the 'claimants' own testimony, that of third parties, *or* that of experts.'") (*McCaig* court's emphasis)); *see also Gilmore v. SCI Texas Funeral Servs., Inc.*, 234 S.W.3d 251, 258 n.4 (Tex. App.—Waco 2007, pet. denied) ("Expert testimony is not required to recover mental anguish damages.").

LKQ has not met its burden of proving by a preponderance of the evidence that Plaintiff failed to mitigate his damages; that his claims are barred by the doctrines of accord and satisfaction; that he has waived his right to recover monetary damages as compensation for LKQ's nuisance; or that he is estopped from recovering monetary damages as compensation for LKQ's nuisance. Although the evidence shows that LKQ at one point offered to help pay Mr. Reed for inconveniences and damage caused by its construction (Tr. 90, lines 4-6, Tr. 95, lines 19-24), and LKQ offered Mr. Reed the sum of $2,775 to that end (Tr. 175, lines 17-25 to Tr. 176, lines 1-16; Def.'s Ex. 19), there is insufficient evidence for the court to conclude that Mr. Reed and LKQ reached an agreement that the sum offered satisfied all amounts due and owing to compensate Mr. Reed for the effect of LKQ's construction on his use and enjoyment of his property, and insufficient evidence that he acted in any manner that would support LKQ's assertion that he failed to mitigate his damages, waived his right to recover damages, was estopped from recovering damages, or that his claim for damages is barred by the doctrines of accord and satisfaction.

Further, although LKQ offered to provide Mr. Reed with twelve, three-inch caliper trees to be placed on his property at no cost to him but at a cost to LKQ of $3,400, Mr. Reed testified that this proposition was not feasible because he was concerned that he would not be able to bale hay in his hay field if leaves and foliage from the trees fell into the hay. Tr. 47, lines 16-18.

The court fully understands there are competing objectives for the use of land; however, the activity of one party should not so substantially and unreasonably restrict the other in the use and enjoyment of his or her property to the extent experienced by Mr. Reed, without adequate compensation. No reasonable person would welcome a 71.5-acre automobile reclamation and parts distribution facility that creates a nuisance in such close proximity to his or her residence and adjacent land. It would be fatuous for the court to not award a reasonable amount of damages to Mr. Reed for the effects of LKQ's conduct, as meticulously herein set forth.

### 2. Exemplary Damages

Mr. Reed's request for exemplary damages will be dismissed because there is no request for exemplary damages in the Joint Pretrial Order (Doc. 69). Even had he attempted to plead or present evidence to the court of the necessary elements of a claim for exemplary damages under § 41.001 of the Texas Civil Practices and Remedies Code, the court would reject his claim. Under Texas law, exemplary damages may be awarded "only if the claimant proves by clear and convincing evidence that the harm . . . results from: (1) fraud; (2) malice; or (3) gross negligence." Tex. Civ. Prac. & Rem. Code § 41.003(a). "'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 41.001(2). "'Malice' means a specific intent by the defendant to cause substantial injury or harm to the claimant." *Id.* § 41.001(7). "Further, Texas law requires proof of two elements to establish gross negligence: an objective element that "the

actor at the time of [the act or omission's] occurrence involves an extreme degree of risk, considering the probability of the potential harm to others[,]" and a subjective element that the actor has "awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others." *Id.* § 41.001(11). Even if asserted in the Joint Pretrial Order, which it was not, the evidence at trial does not support either the objective or subjective elements.

### 3. Equitable Remedies

Another remedy that is sometimes available in nuisance cases is injunctive relief. To be entitled to injunctive relief, Mr. Reed was required to seek some form of permanent injunctive relief. The Joint Pretrial Order does not contain a claim for permanent relief or a pleading or prayer for a permanent injunction. Accordingly, the court concludes that Mr. Reed is not entitled to injunctive relief. *See Kona Tech. Corp.*, 225 F.3d at 604 ("If a claim or issue is omitted from the [pretrial] order, it is waived, even if it appeared in the complaint.") (citations omitted).

Even had Mr. Reed requested equitable relief, to obtain permanent injunctive relief, a plaintiff must plead and prove "(1) a wrongful act; (2) imminent harm; (3) irreparable injury; and (4) no adequate remedy at law." *Radiant Fin., Inc. v. Bagby*, 2017 WL 2927825, at *6 (Tex. App.—Dallas July 10, 2017, pet. denied) (citation omitted).[12] Although Mr. Reed has proved a wrongful

---

[12] Pursuant to the *Erie* doctrine, "federal courts sitting in diversity apply state substantive law and federal procedural law." *National Liability & Fire Ins. Co. v. R.R. Marine, Inc.*, 756 F.3d 825, 834 (5th Cir. 2014) (citation omitted); *see generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938). "Classification of a law as 'substantive' or 'procedural' for *Erie* purposes is sometimes a challenging endeavor." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996) (citation omitted). Here, the court concludes that, unlike temporary restraining orders and preliminary injunctions, which are specifically provided for in Federal Rule of Civil Procedure 65 and are procedures for preserving the status quo pending a determination of the merits, state law provides the standard as to whether a permanent injunction should issue. *See generally* 19 The Late Charles A. Wright et al., Federal Practice and Procedure § 4513 (3d ed. 2016 & Supp. 2019) (collecting cases) ("Permanent injunctions, which are not provided for in Federal Rule 65, however, involve entirely different considerations [than preliminary injunctions or temporary restraining orders], and in general may be granted in a diversity case only if authorized by the relevant state law[.]").

act by LKQ in the construction and operation of its facility, there is no proper request of the court—or evidence at trial—of the remaining necessary factors to support any type of equitable relief. The Joint Pretrial Order and the testimony at trial are silent on the necessary elements of equitable relief including the issue of irreparable injury or whether there is no adequate legal remedy. Mr. Reed, therefore, has failed to state a request for a permanent injunction or equitable remedy of any type.

### 4.    Prejudgment and Postjudgment Interest in Diversity Cases in Absence of Contract or Specific Enabling Statute

Mr. Reed has requested prejudgment and postjudgment interest. In Texas, a claim for prejudgment interest may be based upon general principles of equity or an enabling statute. *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex. 1985). Under both the common law and the Texas Finance Code, prejudgment interest begins to accrue on the earlier of: (1) 180 days after the date a defendant received written notice of a claim, or (2) the date suit is filed. Tex. Fin. Code Ann. § 304.104 (West 2016). "Prejudgment interest is computed as simple interest and does not compound." *Id.* Prejudgment interest is awarded to compensate fully the injured party, not to punish a defendant, and it is considered compensation allowed by law as additional damages for lost use of the money due between the accrual of the claim and the date of judgment. *See Johnson & Higgins, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998). The prejudgment interest rate for property damage cases is "equal to the postjudgment interest rate applicable at the time of judgment." Tex. Fin. Code Ann. § 304.103 (West 2016). As there is no contract or

---

Even were the court to apply federal law in this instance, the outcome would not differ, as the elements substantially overlap, requiring a plaintiff seeking a permanent injunction to allege and prove:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Merritt Hawkins & Assocs., L.L.C. v. Gresham*, 861 F.3d 143, 157-58 (5th Cir. 2017) (quotation marks and citations omitted).

agreement between the parties, or a specific enabling statute, with respect to postjudgment interest, section 304.003 of the Texas Finance Code provides that the postjudgment interest is "five percent a year if the prime rate as published by the Board of Governors of the Federal Reserve System is less than five percent." *Id.* § 304.003(c)(2). As of January 30, 2020, the published rate by the Board of Governors is 4.75 percent, which is less than five percent, and the prejudgment rate, therefore, is five percent per annum.

The parties present no equitable considerations for the court to address, and it is unclear from the record when or whether LKQ received written notice of a claim from Mr. Reed. The court, therefore, determines that prejudgment interest is to be calculated from the date this action was filed on September 29, 2014, to January 29, 2020, the day before the entry of the judgment. The amount of prejudgment interest on $180,550 is $48,179.64.

With respect to an award of postjudgment interest, federal law applies on "any judgment in a civil case recovered in a district court . . . including actions based on diversity of citizenship." *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 7 F.3d 1203, 1209 (5th Cir. 1993) (citation omitted). A court awards postjudgment interest pursuant to 28 U.S.C. § 1961. Accordingly, postjudgment interest shall accrue at the applicable federal rate, which is currently 1.55 percent per annum.

## V. Conclusion

For the reasons stated herein, the court finds in favor of Mr. Reed on his intentional nuisance claims in the amount of $180,550. This sum includes $2,775 for damage caused by LKQ during construction, $2,775 for property damage caused by LKQ during operations commencing in approximately May 2014 through the date of trial, and $175,000 as compensation for Mr. Reed's mental anguish.[13] In light of the court's findings and conclusions herein, it will render judgment

---

[13] The court notes that had the evidence been presented in a more cohesive manner, it would not have taken the court as long as it did to issue its decision. In the final analysis, the court was able to marshal the

in Mr. Reed's favor on his successful claims in the amount of **$228,729.64**, and against him on those claims on which he did not prevail by separate document as required by Federal Rule of Civil Procedure 58. All allowable and reasonable costs will be assessed against LKQ.

**It is so ordered** this 30th day of January, 2020.

Sam A. Lindsay
United States District Judge

---

evidence and conclude without any mental reservation that the record contains sufficient evidence to support the findings and conclusions that it made.